IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | |
|---|---|
| ANALI VIDAÑA, §
     Plaintiff, §
 §
v. § CIVIL ACTION NO. _____
 §
DALLAS INDEPENDENT SCHOOL §
DISTRICT, §
     Defendant. § | |

### PLAINTIFF'S ORIGINAL COMPLAINT

NOW COMES ANALI VIDAÑA, Plaintiff in the above-styled and numbered cause ("Plaintiff"), and files this, her Original Complaint, complaining of the Dallas Independent School District, ("DISD"), Defendant herein. Plaintiff would respectfully show the Court the following:

### I. PARTIES

1.1   Plaintiff Anali Vidaña is an individual residing in Dallas County, Texas. She has been employed by DISD for the past nine years. She is a Hispanic female, and has two children enrolled in DISD, one of whom receives special education services.

1.2   Defendant Dallas Independent School District is a public school district organized and existing pursuant to the laws of the State of Texas. Defendant is a "state actor" within the meaning of applicable law and the actions complained of herein comprise "state action" and were taken under color of law. Defendant may be served by serving its superintendent, Stephanie S. Elizalde, Ed.D., or the president of its board of trustees, Joe Carreón.

### II. JURISDICTION AND VENUE

2.1   This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331; the provisions of 42 U.S.C. §§ 1981, 1983, and 1988; Title VII of the Civil Rights Act of 1964, (42 U.S.C. § 2000e *et seq.*), as well as under the 1st and 14th Amendments to the United States

Constitution.

2.2     Venue is proper in this district and division pursuant to 28 U.S.C. § 1391(b), as all or part of Plaintiff's claims accrued in Dallas County, Texas, which is within this District and Division.

### III.  FACTUAL BACKGROUND

3.1     Plaintiff has been an employee of DISD for nine years. For all those years, up until August 2024, she taught kindergarten at Mockingbird Elementary School ("Mockingbird"), a school within DISD. Plaintiff is certified to teach early childhood through sixth grade, as a bilingual teacher, and has an exemplary distinguished teacher recognition from the Texas Education Agency. She is also certified as master gardener, which is a certification she obtained through the sponsorship Mockingbird's PTA at Mockingbird, so that she could bring those skills into the classroom.

3.2     In addition to being a teacher at Mockingbird, Plaintiff is a Mockingbird parent. Her son attends Mockingbird, and is identified as an emergent bilingual ("EB") student, still learning English, and with special needs, including autism and attention deficit hyperactivity disorder ("ADHD"). Over the past school year, and continuing this year, Plaintiff has been discriminated against based on her race and sex, and has been retaliated against (1) for challenging discriminatory actions within DISD, (2) for speaking up on behalf of her son, and (3) for opposing improprieties by her principal in reporting students learning English as a second language ("ESL").

**Inflation of ESL Numbers at Mockingbird by Principal Huff**

3.3     There is a practice within DISD of inflating the number of students that qualify as ESL, because schools receive additional funding for every ESL student. Plaintiff noticed that this was happening at Mockingbird and, in November 2022, voiced her disagreement with it to the

principal, Margaret Huff ("Huff")[1], who identifies as African American. Huff had been successful at perpetuating this practice by manipulating teachers that require work-sponsored visas into managing the necessary paperwork for emergent bilingual funding. These teachers were aware that if they spoke out against Huff about this that they were in jeopardy of losing their jobs and, in turn, their visas that allow them to stay in the United States.

3.4     Huff maintained a group of teachers and administrators that she considered to be her favorites. These teachers and administrators were given preferential treatment such as being allowed to arrive at work late without reprimand. Other teachers were allowed to use derogatory language with Huff's knowledge of it without reprimand. In exchange for these benefits, Huff's favorites provided statements or anything else needed so that Huff was free to harass and attempt to remove those that she did not like. In this instance, Huff did not like Plaintiff challenging her false ESL numbers.

**Plaintiff's advocacy for support and services due her son**

3.5     As both a parent and a teacher at Mockingbird, Plaintiff is considered by the school to be a person that holds a "dual role". On January 24, 2024, Plaintiff sent an email to Mockingbird's Language Proficiency Assessment Committee ("LPAC") with questions and concerns about whether her special needs son was receiving the educational support that was assigned to him. In addition, Plaintiff questioned the decisions about the language in which her son took his exams for academic progress. She also reached out to DISD's Special Education Compliance and Instructional Support Coordinator and the Dual Language Department Executive Director for assistance. Plaintiff included Huff, communicating with her to see how she wanted

---

[1] DISD fired Huff at the end of the 2023-2024 school year.

Plaintiff to handle these questions due to Plaintiff's dual role. Huff refused to speak with Plaintiff about it at that time.

3.6   On January 30, 2024, Plaintiff had a parent-teacher conference, regarding her son, with Huff, Assistant Principal Roderick Goudy ("AP Goudy"), her son's three teachers,[2] LPAC co-chair Adriana Gutiérrez, LPAC representative Stephanie Cantu, and Plaintiff's husband Rubén Mandujano. The meeting was to discuss the concerns Plaintiff had expressed in her January 24, 2024, email. Plaintiff was participating in this meeting as a parent, not a teacher. During this meeting Huff spoke to Plaintiff, in Plaintiff's capacity as a parent, very sternly. Huff told Plaintiff that she did not like it when Plaintiff reached out to others about her son's educational needs and that, going forward, Plaintiff was only to speak with those present during this meeting. Following this meeting, other teachers were told by Huff to "stay out of the situation" with Plaintiff's son. Huff used fear tactics to manipulate and control her faculty and staff into compliance.

**Retaliation in the form of "coaching" and sham write-ups**

3.7   On February 2, 2024, Plaintiff was informed that she had been selected to receive Amplify[3] coaching support. Amplify coaching support is a form of a performance improvement plan in which a teaching coach (a Demonstration, or "Demo" Teacher) is present in the classroom to interject during lessons, to "coach" the teacher during instructional time, model lessons, provide feedback, and follow-up with identified teachers that report to the campus principal. It is important to note that until that day, every other teacher with an Amplify coach was assigned this coaching at the beginning of the school year, or in December at the beginning of a new semester. Plaintiff was the only teacher to receive the assignment in February, with the semester well under way, and

---

[2] Plaintiff's son's teachers were Special Education teacher Ryan Biner, 2nd grade Dual Language English component teacher Guadalupe Willingham, 2nd grade Dual Language Spanish component teacher Chantal Perera.
[3] "Amplify" is a lesson-planning program used in DISD in both English language arts and Spanish language arts classes.

it did not come until after she raised concerns about her son. This was retaliatory and, when Plaintiff mentioned that to principal Huff, Huff immediately assigned other teachers to an Amplify coach so as to remove the appearance of retaliation from Plaintiff's situation.

3.8     Later, when Plaintiff asked what student or teacher needs were identified to warrant the coaching, Assistant Principal Deranda Meyers ("AP Meyers") told Plaintiff that no teacher or student need was identified. This confirmed Plaintiff's belief that the coaching did not arise out of necessity but out of retaliation. On the same day Plaintiff was written up for the first time. The write up from Huff stated that "[Huff] received personal emails from [Plaintiff] during instructional time" and that Plaintiff should limit emails during instructional time because the priority is her students. The write up (Case No. 11333) was grieved February 21, 2024, and the write-up was removed without a hearing on March 5, 2024. Afterwards, DISD asked Plaintiff to sign a document stating that neither party was liable for any wrongdoing. In other words, the write up was an indefensible sham.

3.9     The Amplify coach, one of Huff's friends, came to observe Plaintiff's class. The coach does not speak any Spanish and Plaintiff's entire class was taught in Spanish. As such, the Amplify coach chosen was not qualified to coach or evaluate Plaintiff as a teacher and was clearly only there to intimidate Plaintiff. On February 8, 2024, the coach sent Plaintiff notes about her observation #1, with timestamps, quotes, and the incorrect focus of the lesson that Plaintiff was doing in Spanish using the Amplify curriculum. The feedback had Huff, AP Meyers, and AP Goudy copied on it. No other teachers with the same coach had the administration copied on their feedback emails. This was discrimination and harassment meant to single Plaintiff out and undermine her in her role as teacher. The Amplify coach was working directly with Huff to make Plaintiff look incompetent and incapable.

**Huff derides Plaintiff to her face, citing "cultural differences"**

3.10   In a meeting on February 8, 2024, Huff told Plaintiff that she could not lead the school with Plaintiff or her child in it because of the "cultural differences between us." Huff thus stated directly that she could not work with Plaintiff – or have her child in the school – because Plaintiff is Hispanic. This statement was obviously discriminatory. Huff said that it did not matter if Plaintiff had "family ties" to the school because she knew that if "someone like [Plaintiff]" stayed in the school, they would be in the same position having the same conversation 2-3 years from that day and that she "could not lead the school with someone like [Plaintiff]" in it. After this meeting Huff began to monitor Plaintiff more closely and would eavesdrop on Plaintiff's conversations with other staff members.

3.11   Adriana Gutierrez told Plaintiff (in Spanish) that she was afraid of speaking up as LPAC co-chair and advocating for Plaintiff's son because of what had happened to Plaintiff at the parent teacher conference on January 30, 2024. She said she was afraid because of her visa situation, her husband that works for DISD, and the effect it would have on her job or her children that attended Mockingbird.

**The hostile work environment and harassment intensify**

3.12   On February 23, 2024, Plaintiff had a very brief conversation with third grade general education teacher Kyleigh Campbell ("Campbell") concerning Amplify feedback and observations. Plaintiff knew that Campbell had the same Amplify coach who was observing Plaintiff. Office data controller, Mercedes Carbajal, walked by the two teachers, and hearing parts of their conversation, lingered close by. Three days later, on February 26, 2024, Huff claimed that Campbell reported Plaintiff for making her feel uncomfortable. Huff handed Plaintiff a letter of concern (the "Letter") on February 27, 2024, stating that Campbell reported Plaintiff for repeatedly

requesting her feedback from the Demo Teacher observations and that she repeatedly declined Plaintiff's requests to share the coach's feedback by phone, GroupMe messages, and emails.

    3.13    Plaintiff immediately knew the report had been fabricated by Huff because she had never spoken with Campbell on the phone. The Letter also stated that Plaintiff was "seen on footage" and that Plaintiff "removed" her students "outside the employee's classroom on one instance to such a request [sic]." This was Huff's way of saying Plaintiff had taken her students out of class to go to Campbell's classroom to talk to her. It was also not true. Principal Huff claimed that Plaintiff was "engaging in" activities that "interfere with" her "colleagues' ability to perform their duties" and that Plaintiff was distracting her colleagues and the quality of instruction of the students. The letter stated that Plaintiff violated DH Exhibit Standard 2.4 (The educator shall not interfere with a colleague's exercise of political, professional, or citizenship rights and responsibilities) and Standard 2.6 (The educator shall not use coercive means or promise of special treatment in order to influence professional decisions of colleagues.) Plaintiff was directed to "engage professional communication and conduct towards colleagues". The Letter ends with "Failure to comply with the policies and directives contained in this letter may result in further adverse actions against you."

    3.14    On the same day a Hotline report (#8211) was filled out by Equal Employment Opportunity Compliance Manager, Thomesa Broadnax, on Huff's behalf. Huff claimed Plaintiff asked what a staff expectation meeting would be about in the front office in an aggressive tone and manner. The Hotline report also states that the office clerk, Noemi Tapia, asked Huff if she was okay and provided Huff with a statement about Plaintiff's behavior. In the report Huff states that Plaintiff's behaviors were unstable and unclear and that Huff fears for her physical safety and student safety. This hotline report was fabricated by Ms. Huff to get rid of Plaintiff and is patently

false. This is a tactic that Huff has used with other teachers that she does not like to intimidate them into quitting.

3.15   Huff handed the Letter of concern to Plaintiff at a staff expectation meeting. This was Plaintiff's second write-up. Before she read the Letter, Huff said, "Before I read it, Mrs. Vidaña, what I want to say is that I would like this to remain here at this level." Plaintiff filed a grievance (Case No.11373), seeking removal of the write-up and the hearing was recorded. The grievance took place on April 2, 2024, before Huff, and Huff denied Plaintiff's grievance on April 10, 2024. Plaintiff appealed the decision on April 16, 2024. Assistant General Counsel of Legal Services for Dallas ISD, Connor Malone ("Malone"), sent Plaintiff different versions of the write-up, to see if she would agree to one, and set up a staff expectation meeting with Huff and Executive Director Katherine Eska ("Eska") in exchange for Plaintiff dropping her grievance. The Letter was removed on May 3, 2024, without conditions or contingencies after Plaintiff refused to be written up and reprimanded by her principal for filing a grievance. This is another instance of retaliation and harassment for Plaintiff voicing her concerns about both her son and the handling of paperwork for emergent bilingual students.

3.16   On March 18 and 19, 2024, two more anonymous hotline reports were made about Plaintiff. Both reports suggested that Plaintiff was unprofessional and that she was creating an unsafe environment both for teachers and students. As these are the same comments that Huff had previously made to Plaintiff, these reports seem to have been made at Huff's request, to build a case against Plaintiff. One hotline report went so far as to say that an investigation into Plaintiff's "idiotic behavior" needed to occur in order to "STOP IT immediately."

3.17   One afternoon in the hallway Plaintiff's Amplify coach told her that she has never given Plaintiff feedback on Amplify, and that she could not set a coaching goal for Plaintiff, and

that she would continue to visit Plaintiff's classroom until Plaintiff complied, in the coach's opinion, with using the Amplify curriculum during Spanish Language Arts time. The coach also said that AP Meyers (a monolingual English speaker), told her she had checked the scope and sequence and that Plaintiff was not doing Amplify. Neither the coach nor AP Meyers speak Spanish so there was no way for them to know that Plaintiff was, in fact, following Amplify exactly, because the class was taught entirely in Spanish.

**The First Reassignment of Plaintiff**

3.18    On March 26, 2024, in Principal Huff's office, Plaintiff was given her 2024-2025 new grade level placement of 2nd grade Dual Language – moving Plaintiff out of kindergarten, involuntarily. In the same meeting, Huff read the hotline report to Plaintiff and informed Plaintiff of the deadline to respond. Chantal Perera and Plaintiff were the only teachers being moved by force to a different grade level. Their non-minority counterparts being moved had chosen the grade level they would like to teach and were allowed to decide if they would be self-contained or departmentalized. Plaintiff was also given the burden of arranging her own move to her new classroom. She would have to move furniture, learning manipulatives, books, office supplies, etc. No one of any other race was forced to do this.

3.19    On March 28, 2024, Huff and Eska pulled Plaintiff into the main office to get Plaintiff to call a number in an envelope Huff handed her. This envelope had a flier for the Employee Assistance Program (EAP). EAP is for employees who have questions about handling stress at work and home, parenting and childcare, managing money, or health issues, through Telus Health, for a confidential service. Huff mentioned twice that Plaintiff needed to say that "my principal told me to call." She also said that Plaintiff's class would be covered for her and that Plaintiff needed to take the rest of the day off because she looked distressed. Later that day, around

2:05 p.m., Ms. Yesenia Moreno walked into Plaintiff's classroom and said she had seen data controller Mercedes Carbajal and office clerk Noemi Tapia monitoring the cameras and writing down dates and times on a piece of paper saying, "she looked away from the students right there". Other teachers were not being monitored on the security footage with the intention of catching them doing something wrong. This is clearly discriminatory and an example of how Huff used her staff to look for ways to force Plaintiff out of her job.

3.20    Plaintiff reached out to Hilda Duarte, an advocate in LULAC, for help with the retaliation she was facing at her job after speaking up about LPAC and Special Education. Ms. Duarte informed Plaintiff that she was not the first or second Hispanic female teacher to reach out to her from Dallas ISD about retaliation after speaking up about LPAC concerns at a school. Plaintiff and other Hispanic employees, especially Hispanic women, are notably and demonstrably being discriminated and retaliated against by the administration at DISD.

3.21    At the beginning of May, Plaintiff reported DISD to the Texas Auditor's Office for fraudulent submissions in which the ESL numbers were inflated. A few days later AP Meyers said Plaintiff was being moved to 2nd grade because of her English proficiency. Thus, instead of using her bilingual credentials to teach kindergarten in Spanish, Plaintiff would be moved to second grade and teach the 50% of the bilingual class that was in English. This move was allegedly because Plaintiff's English lacks an accent. It also, however, gave her principal discretion to take away her stipend for bilingual teaching.

3.22    As it turned out, in switching Plaintiff out of kindergarten to 2nd grade, DISD moved a 2nd grade teacher, Ms. Perera, to kindergarten, who was not certified in early childhood. When it was pointed out that Ms. Perera lacked the early childhood certification necessary to teach kindergarten, instead of returning Plaintiff and Ms. Perera to the grades they had taught previously,

there was a three-way shuffle at Mockingbird: moving Plaintiff from kindergarten to second grade, moving the second grade teacher to first grade, and moving a first grade teacher to kindergarten. All three were Hispanic women and none of them asked to be moved.

**Plaintiff's performance review scores – her "Summative"**

3.23   Plaintiff met with AP Meyers to discuss Plaintiff's Summative, (a year-end review used for figuring, among other things, compensation). The scoring scale on the summative ranges from 0-3 (0- .5 Unsatisfactory, 1- 1.5 Progressing, 2-2.5 Proficient, 3- Exemplary). Plaintiff asked AP Meyers if there was any area in which she would be receiving a score less than a 3 and AP Meyers said no. Nevertheless, on May 9, 2024, Plaintiff's summative was a 2 in domains 4.1, 4.2, and 4.4, regarding following policies. Neither in her meeting with AP Meyers, nor anywhere else, was Plaintiff given any notice or warning that she was not following policy or that she had not complied in following policies. Plaintiff submitted a rebuttal to the Summative on Cornerstone[4] and her lawyer filed a grievance (Case No. 11500) on it as well, which was assigned to Huff. The hearing was recorded and took place on June 4, 2024, with Principal Huff and DISD's assistant general counsel Malone, present. On June 10, 2024, Plaintiff received the decision that her grievance was denied.

3.24   On June 10, 2024, Plaintiff attended a mediation meeting with Associate Superintendent Laura Garza ("Garza"), Eska, mediator Henry Woods II, and LULAC advocate Hilda Duarte. It was evident that the Garza and Eska showed up to the meeting without understanding the basic facts to effectively help better the employee/employer relationship. Plaintiff was given two suggestions at the end of the meeting: consider a transfer (with the deadline of June 13th to decide), and not to report above Huff's head as either a parent or as an employee.

---

[4] Cornerstone is an online platform used by DISD for "Career Management," that is, performance evaluations and employee responses.

These suggestions clearly were not given in good faith to help Plaintiff but instead to protect Huff, even at the cost of Plaintiff's son's well-being. This was the final discriminatory action taken against Plaintiff before Huff announced that she would not be returning to DISD in the fall.

3.25   The discrimination and retaliation did not end with Huff's departure.  On or about June 24, 2024, Plaintiff filed her EEOC charge, alleging discrimination on the basis of race and sex, hostile work environment, and retaliation under Title VII, and reciting the events set forth above.

**Retaliation continues**

3.26   By early July, 2024, Plaintiff was stripped of the $4,000.00 annual stipend she received for teaching bilingual classes. Plaintiff's attorney wrote to DISD regarding such retaliatory action, and DISD restored the stipend, saying there had been an error.

3.27   Similar "errors" continued to befall Plaintiff when she returned to the Mockingbird campus in August 2024. For example, she was excluded from a welcome back email, was not informed of a "new rule" that classroom doors must be kept open, until the new principal publicly reprimanded Plaintiff in front of her class and a Special Education Teacher Assistant, Mrs. Dyma, for violating the "rule," which had never been communicated to Plaintiff. By August 14, 2024, a member of Eska's ILT team came to observe Plaintiff, without warning, which Plaintiff had never experienced before.

3.28   Also over the summer, Plaintiff participated in a Level II Grievance hearing within DISD, regarding her Summative, and her grievance was denied. She has timely requested, and is awaiting a Level III hearing, which DISD has not yet scheduled.

3.29   DISD continues to ignore Plaintiff's son's status. Mockingbird has failed to address the compensatory time he is owed and has allowed his special education teacher to isolate him in

a classroom alone with the teacher. Plaintiff informed DISD of the discrepancies in the services he was receiving compared to the services DISD claimed he was receiving, and what his education plans required him to receive. She brought these matters to DISD at the campus level, as a parent, and to DISD's special education superintendent. As recently as August 2024, DISD informed Plaintiff that her concerns about her son would be addressed, but nothing has been done.

**The Second Reassignment -- DISD uses Plaintiff's ties to Mockingbird in an effort to silence her**

3.30    On Tuesday, September 17, 2024, Plaintiff was called out of her classroom and was given a letter titled "Excess & New Assignment Notification Letter." No person present in the room when she was given the letter could explain the reasoning or what policy permitted it, but effective immediately, Plaintiff was no longer teaching at Mockingbird. The letter stated that her service at her "current campus" would go through Friday, September 20, 2024, but after that she was to report to Jordan Elementary, a different DISD elementary school, one with a markedly more Hispanic student body and faculty. DISD had sent Plaintiff a clear message that it could and would put Plaintiff in her place.

3.31    On September 20, 2024, Plaintiff's attorney again wrote to DISD, requesting an explanation for the determination that Plaintiff was "excess," if there was an explanation other than retaliation:

> No one who met with Ms. Vidaña yesterday could explain why or how she was selected for reassignment, giving every appearance of further retaliation – either for her internal grievances, for filing an EEOC charge, or for her efforts to protect her son.
> We write to make respectful demand that you provide an explanation for this action against Ms. Vidaña – taking her out of the school her sons attend, doubling her commute time, and removing her from a school where she has had a positive impact for nine years – or take steps immediately to assign her back to Mockingbird.
> Please give us your immediate written reply.

In addition, Plaintiff initiated a new internal grievance with DISD, challenging the transfer.

3.32    On September 25, 2024, two attorneys from DISD's professional standards office, Mariah March and Razieh Dobbs, came to Plaintiff's counsel's law firm to meet with Plaintiff and her lawyers. The DISD attorneys stated that they were investigating allegations of discrimination, but they would not agree to record their interview of Plaintiff, nor to have it recorded.

3.33    By the next day, September 26, 2024, Tiffany Huitt, DISD's Chief of School Leadership, had told LULAC representative Hilda Duarte that Plaintiff could return to Mockingbird, and set up a meeting with Plaintiff for Wednesday, October 2, 2024. The meeting was thereafter postponed by DISD to Tuesday, October 8, 2024.

3.34    Meanwhile, on Friday, October 4, 2024, Nicole Herron, another DISD attorney, called Plaintiff's counsel and offered to meet to discuss resolution of Plaintiff's grievances and EEOC complaint. Plaintiff's counsel discussed the status with Ms. Herron by telephone, and confirmed in email at 11:38 that morning:

> As we explained, there is currently a meeting scheduled for Tuesday, October 8, at 9 am, between Tiffany Huitt, our client, and a representative of LULAC. Ms. Huitt has stated that they will be discussing returning Ms. Vidaña to Mockingbird Elementary, where she has taught for the past 9 years, and where her children attend.
>
> If you wish to meet with us, it will need to be fairly soon, as Ms. Vidaña has less than three weeks left to file suit against the district under her right to sue letter from EEOC/DOJ.

That afternoon, Ms. Herron emailed,

> As discussed, my client has given me authority to offer Ms. Vidana a transfer back to Mockingbird Elementary School in exchange for the following: (1) withdrawal of all active and/or pending grievances; (2) withdrawal of all informal complaints made to Dallas ISD; and (3) withdrawal of all pending charges of discrimination and/or pending litigation.

Plaintiff's counsel emailed Monday that she could not accept those terms, and would wait to see how the meeting with Ms. Huitt went. Ms. Huitt thereupon cancelled the meeting with Plaintiff. Ms. Herron confirmed by telephone on that b*ecause Plaintiff had not agreed to drop all previous grievances, the offer to return to Mockingbird was no longer on the table*. DISD proceeded to tell anyone who asked – chiefly parents at Mockingbird who were troubled by Plaintiff's abrupt departure – that it was Plaintiff who had turned down an offer to return to her Mockingbird campus.

### DISD's Shameful Treatment of Plaintiff

3.35   In short, DISD looked the other way when the Mockingbird principal, Huff, falsified ESL numbers, and Plaintiff brought the issue to light, as well as Huff's practice of strong-arming and threatening Latina employees to get their cooperation. Thereupon, Huff increased her discrimination against Plaintiff, retaliating against her and creating a hostile work environment; when Plaintiff's son was not provided the required accommodations and services for his ADHD, autism and EB (emergent bilingual) needs, Plaintiff advocated for him. This brought additional retaliation, including an assignment of Plaintiff to teach a different grade, unfounded negative points on her Summative (affecting her pay), and petty attacks, both directly by DISD administrators to Plaintiff herself, and indirectly through bad-mouthing her to other employees.

3.36   In an appalling final injustice, DISD removed Plaintiff from Mockingbird Elementary, on a pretext so flimsy the District knew it could not be justified. The removal was intended for one reason only – to force Plaintiff to release DISD from everything it had done up until then without DISD correcting or addressing any of its conduct. As set forth above, DISD moved Plaintiff in September, and almost immediately offered to move her back – so long as she withdrew her Title VII claims, her grievances related to previous DISD actions, and all complaints, formal or informal, including her advocacy on behalf of her son.

3.37    On July 25, 2024, Plaintiff received a letter from the Department of Justice, notifying her of her right to sue. Plaintiff has thus exhausted her administrative remedies with respect to her state and federal law discrimination claims, and sues for discrimination, retaliation, and hostile work environment by DISD under Title VII. The conduct of DISD in creating a hostile work environment, favoring non-Hispanic employees, and retaliating against Plaintiff, has caused Plaintiff damages for which she now sues.

## IV.  CAUSES OF ACTION

*Alternative Pleadings*.  To the extent necessary, each of the claims set forth below is pleaded in the alternative. All factual allegations set forth above or below are incorporated into each claim.

**A**    *Violation of Title VII* – **Discrimination on the bases of sex and race/ethnicity Retaliation for Protected Conduct under Title VII**

4.1    Title VII prohibits discrimination based on race, color, religion, sex, or national origin. *See* 42 U.S.C. §2000e-2(a)(1).  Specifically, Title VII prohibits discrimination based on those characteristics "with respect to [an employee's] compensation, terms, conditions, or privileges of employment."

4.2    Title VII also prohibits harassment and retaliation by an employer against an employee who opposes an employment practice that violates Title VII. *See* 42 U.S.C. § 2000e-3(a). Plaintiff opposed the discrimination in her workplace against Hispanic women employees and Hispanic or Spanish-speaking students.

4.3    Plaintiff timely dual-filed a charge of discrimination in employment against DISD, in administrative proceedings with the Texas Workforce Commission Civil Rights Division and the Equal Employment Opportunity Commission, in which she has asserted that she was treated in a disparate and discriminatory manner due to her race and sex, subjected to a hostile work

environment, and retaliated against, all in violation of federal and state law, including Title VII of the 1964 Civil Rights Act

4.4    On July 25, 2024, the Civil Rights Division of the United States Department of Justice issued its Notice of Right to Sue. Plaintiff has therefore exhausted her administrative remedies with respect to her state and federal law discrimination claims, and brings her claim for discrimination by DISD under Title VII. The conduct of DISD in creating a hostile work environment, discriminating against Plaintiff and other Hispanic women at Mockingbird on based on race and sex, and retaliating against Plaintiff when she raised concerns regarding discrimination against herself and others, has caused Plaintiff damages for which she now sues.

**B**    *Violation of First Amendment* **– Brought Pursuant to 42 U.S.C. § 1983 – Denial of Free Speech and Freedom to Petition for Redress of Grievances**

4.5    The violations of federal statutes and the United States Constitution complained of herein were done by state actors — DISD, its Board, and its administrators to whom authority had been delegated. All actions and decisions complained of herein were made by policymakers of the institution, acting under color of law. In the alternative, all actions and decisions complained of herein were ratified and knowingly adopted by policymakers of the institution, acting under color of law.

4.6    All factual allegations set forth above are incorporated herein by this reference. As set forth above, Plaintiff exercised her protected rights under the First Amendment in advocating for her son's special education needs, and in raising issues of fraud in the reporting of ESL students by Mockingbird's principal. She was not acting as an employee in doing so, but as a citizen reporting a matter of public concern, including in her role as parent of a child with special needs. DISD retaliated against her for speech unconnected with the performance of her job duties, in violation of Plaintiff's rights under the First Amendment. he First Amendment protects all such

actions from interference by DISD, including protecting Plaintiff from retaliation by DISD for exercising her First Amendment rights.

4.7   Defendant's policies, as written and/or as applied to Plaintiff, resulted in actions taken to adversely affect Plaintiff in her employment, depriving Plaintiff of her rights under the First Amendment to freedom of speech and freedom to petition for redress of grievances. Such wrongful conduct was caused by policymakers of Defendant, including its Superintendent, and such conduct was sanctioned, through action and/or inaction, by Defendant's Board of Trustees, the Superintendent, and others, all singularly or collectively acting as policymakers for Defendant in this case.

4.8   Plaintiff has been damaged as a direct and proximate result of this wrongful conduct by Defendant. Accordingly, Plaintiff seeks to recover her damages from Defendant, including, without limitation, loss of income and benefits, mental anguish, nominal damages, if applicable, and any and all other remedies afforded and/or available under law and/or in equity, including but not limited to injunctive relief, equitable relief, and her attorneys' fees and costs.

## V.   REQUESTED RELIEF

5.1   As the direct and/or proximate result of DISD's actions complained of herein, Plaintiff has been damaged and seeks recovery of the full measure of relief and damages against DISD, including but not limited to actual and/or economic damages, nominal damages, if applicable, compensatory damages, damages for mental anguish and emotional distress, and all equitable relief to which she may be entitled.

## VI.   FEES, COSTS, AND INTEREST

6.1   Plaintiff has retained the law firm of Hill Gilstrap, P.C. to represent her in connection with this matter, and has agreed to pay the law firm its reasonable and necessary

attorney's fees and costs in connection with such representation. Without waiving and/or limiting any other relief requested, Plaintiff seeks to recover her reasonable and necessary attorneys' fees and costs incurred and to be incurred in bringing this suit and in all appeals of this suit, as permitted by applicable law, specifically including 42 U.S.C. § 2000e-5(k) and 42 U.S.C. § 1988, or in equity.

6.2     Plaintiff is also entitled to and seeks to recover costs of court, expert witness fees, along with pre-judgment and post-judgment interest at the maximum rate permitted by law.

## VII.  JURY DEMAND

7.1     Pursuant to Rule 38, Federal Rules of Civil Procedure, Plaintiff requests trial by jury.

## PRAYER

WHEREFORE, PREMISES CONSIDERED, Plaintiff prays that Defendant be cited to appear and answer, and that, upon final hearing, Plaintiff recover judgment against Defendant for the relief set forth below:

a.  Any and all amounts recoverable and/recognizable as damages and/or nominal damages;

b.  Litigation expenses and costs, including but not limited to her reasonable and necessary attorneys' fees;

c.  Pre-judgment and post-judgment interest, at the maximum rate allowed by law; and

d.  Such other and further relief, whether general or special, at law or in equity, to which Plaintiff may show herself justly entitled.

Respectfully submitted,

*/s/ Frank Hill*
Frank Hill – State Bar No. 09632000
fhill@hillgilstrap.com
Stefanie M. Klein – State Bar No. 11565650
sklein@hillgilstrap.com

**HILL GILSTRAP, P.C.**
1400 West Abram Street
Arlington, Texas 76013
Telephone:     817-261-2222
Facsimile:      817-961-4685

**ATTORNEYS FOR PLAINTIFF**